UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:18-CR-368 |
| | § | |
| JONATAN AGUILAR-GARZA | § | |

## ORDER

Defendant has been indicted for unlawfully possessing a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(5)(A), 924(a)(2). Now pending before the Court is his Motion to Suppress (Dkt. No. 20), which presents two primary issues: (1) whether Defendant was unconstitutionally detained when he admitted to having a firearm inside his vehicle, and (2) if so, whether evidence of his confession and the firearm should be suppressed under the exclusionary rule. For the following reasons, the Court answers yes to both questions. Defendant's Motion to Suppress is hereby **GRANTED**.

## I. Procedural History

After receiving Defendant's Motion to Suppress, the Court held an evidentiary hearing where the Government presented the testimony of Border Patrol Agents Cesar Villarreal, Jose Luis Martinez, Daniel Aguilar, and HSI Special Agent Amy Rodriguez. Because Agent Martinez initiated the relevant encounter with Defendant, his testimony was the most important to the Government's case; it also proved the most harmful. Once on the stand, the agent contradicted himself so often that he eventually asked whether he could just read his answers from a previously prepared report. Later, Defendant took the stand to share with the Court how the relevant

events played out from his perspective.

At the hearing's conclusion, the Court emphasized that the Government's witnesses had failed to present a cogent chronology of the events leading up to Defendant's arrest. The Court therefore ordered both Parties to submit a *complete* timeline of what transpired between Defendant and the Border Patrol agents, as reflected in the witnesses' testimony. The Court made clear that it did not want a timeline reflecting what the agents *eventually* said on the stand; instead, any proposed timeline was to disentangle the myriad statements that agents provided, giving specific attention to any contradictions.

Despite the Court's instructions, the Government provided a timeline of events that was selective at best—it cherry-picks favorable components of Agent Martinez's testimony and splices them together into a seemingly coherent timeline. Nevertheless, based on the evidence submitted at the hearing, the Court makes the following factual findings.

## II. FACTUAL FINDINGS

On May 6, 2018, Defendant was driving through Hebbronville, Texas, when his phone slipped from his truck's center console. (Dkt. No. 45 at 242). It was around 10:30 at night, so Defendant pulled over and activated his hazard lights while he fished for his device. (*Id.*). Within thirty seconds, he had stepped out of his truck, opened the back door, and successfully retrieved his phone. (*Id.*).

Afterward, Defendant switched off his hazards and drove to a nearby Lavame Car Wash to rinse off his vehicle. (*Id.* at 56, 243). Parking inside one of the wash

2

stalls, Defendant again got out of the vehicle—quarters in one hand, a Monster Energy drink in the other. (*Id.* at 117–18, 243). A minute later, he was startled by a voice from behind: "Do you speak English or Spanish?" (*Id.* at 133, 243). Defendant turned and came face-to-face with Border Patrol Agent Jose Luis Martinez. (*Id.* at 132).

Agent Martinez had begun his shift at 10:00 p.m., and heard that a group of undocumented aliens might be travelling through the Hebbronville area, heading roughly north toward Highway 285. (*Id.* at 51–52). The suspected group was being tracked through an area south of the highway, about a 20-minute walk from the Lavame Car Wash, so agents were instructed to keep the roads "hot" (i.e., to make their presence known by driving around) to deter the group from entering town. (*Id.* at 35–36, 39–40, 52). While driving, Agent Martinez noticed Defendant's vehicle pulled over with its hazard lights blinking. (*Id.* at 53). After the agent made a U-turn, he rediscovered Defendant's vehicle at the Lavame Car Wash. (*Id.* at 55–56). Agent Martinez parked his own vehicle behind Defendant's and ran a license plate check: the vehicle was registered to an address in Ganado, Texas. (*Id.* at 57). The agent stepped out of his vehicle and approached Defendant. (*Id.* at 56–59).

"Do you speak English or Spanish?" Startled, Defendant turned and answered in English, "What do you want? I speak both." (*Id.* at 59, 135, 244). The agent noted that Defendant lacked any sort of foreign accent and spoke English well. (*Id.* at 67). He asked what Defendant was doing in the area, but Defendant was guarded; he said he knew his rights and did not have to tell Agent Martinez anything. (*Id.* at 73).

Undeterred, the agent turned the subtext of the encounter into text: he accused Defendant of either being an illegal alien or of transporting them. (*Id.*). Defendant reiterated to the agent that he had done nothing wrong and was not legally required to answer any questions. (*Id.* at 73–74, 244). Agent Martinez let Defendant know that he would not be allowed to leave without answering questions: "[L]ook, the faster you tell me—show me some ID and the faster you tell me who you are, and I find out who you are, we'll leave. Don't be a faggot."[1] (*Id.* at 62, 74–76, 147–48).

After his initial resistance, Defendant complied, pulling a wallet out of his back pocket and handing over a Texas Limited Term Driver's Permit. (*Id.* at 140, 245–46). Agent Martinez inspected the permit and inquired about the phrase "Limited Term." (*Id.* at 246). Defendant responded that it was only a Limited Term Permit because he was not a United States citizen. (*Id.*). That development piqued the agent's interest; he asked Defendant whether he was a resident alien or had legal documents that allowed him to be in the United States. (*Id.* at 66, 82, 150, 246). Defendant answered that he was not a resident alien but that he had proof that he was permitted to be in the United States—located in Defendant's wallet was his Deferred Action for Childhood Arrivals (DACA) work authorization card.[2] (*Id.* at 67, 245–47).

---

[1] The use of derogatory epithets is unbecoming of those who represent the U.S. Border Patrol, which "holds itself to the highest standards of integrity and professionalism." *Honor First: U.S. Border Patrol's 93 Years of Service*, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/newsroom/blogs/honor-first-us-border-patrol-s-93-years-service (last updated June 20, 2017).

[2] "On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several guidelines may request consideration of deferred action for a period of two years, subject to renewal. They are also eligible for work authorization." *Consideration of Deferred Action for Childhood Arrivals (DACA)*, U.S. CITIZENSHIP

4

"The sooner we verify your immigration status, then you can leave." (*Id.* at 210). Defendant was reluctant to show his DACA card to Agent Martinez. (*Id.* at 247). He was at neither a border crossing nor a checkpoint, and could see no justification for this detention and interrogation. (*Id.*). But Agent Martinez threatened to have Defendant's DACA status revoked unless he turned over the card. (*Id.* at 249–50). Defendant grudgingly acquiesced. (*Id.* at 250).

After Defendant handed over his DACA card, two other Border Patrol agents arrived at the car wash. (*Id.* at 251). Agent Martinez told one of the newcomers that Defendant was a DACA recipient, which prompted an exchange of looks that Defendant interpreted as belittling. (*Id.* at 253–54). The two additional agents, Aguilar and Divas, asked Defendant what he was doing in the area, and he told them that he was waiting on a girl. (*Id.* at 252). They wanted to know who she was, where she lived. (*Id.* at 252–53). Defendant thought these questions, too, were invasive and unwarranted. (*Id.* at 253). He shot back at them: "I can't tell you because it could be your sister or it could be your wife." (*Id.* at 252, 254–55). Defendant's inappropriate

---

AND IMMIGRATION SERVICES, https://www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca (last updated Feb. 14, 2018). An individual would only be eligible for DACA if he: (1) was under the age of 31 as of June 15, 2012; (2) came to the United States before his 16th birthday; (3) continuously resided in the United States between June 15, 2007, and the date of his application; (4) was physically present in the United States on June 15, 2012, and at the time of making his request for consideration of deferred action with USCIS; (5) had no lawful status on June 15, 2012; (6) was currently in school, had graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and (7) had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety. *Id.* Defendant legitimately possessed a DACA card, demonstrating that Government officials who previously reviewed his application and history concluded that he met that criteria.

and ill-advised wisecrack did not go over well with the agents. (*Id.* at 255). Agent Martinez began cursing and grabbing his crotch in a display of machismo directed at Defendant. (*Id.*).

One of the agents stepped away to check that the documentation provided by Defendant was legitimate; a few minutes later, he came back to announce that Defendant was clean. (*Id.* at 256). Apparently dissatisfied with that outcome, the agents asked to search Defendant's truck. (*Id.* at 256–57). Defendant refused, inciting yet another back-and-forth with Agent Martinez. (*Id.* 256–58). When the agent told Defendant that he would do whatever was necessary to search the truck, Defendant decided it would be prudent to record the encounter on his phone. (*Id.* at 258).

Defendant's phone was on top of the center console in his truck, but when he took a step toward his vehicle, Agent Aguilar put his hand up to stop him. (*Id.*). Agent Martinez told Defendant that he would not be allowed to enter the vehicle because the agents could not be certain that he was not reaching for a gun. (*Id.* at 85). Defendant responded that he only wanted to grab his phone and record their encounter, but the agents would not relent. (*Id.* at 258–59). They demanded to know whether Defendant had drugs or people in his truck. (*Id.* at 260). He told them he did not. (*Id.* at 261). They asked if he had a gun in it. (*Id.* at 260). He told them that he was not required to answer that question. (*Id.* at 85). The agents upped the ante: they told Defendant that if he would not allow them to search his truck, they would simply bring a dog. (*Id.* at 96, 262).

6

Jim Hogg County Sheriff's deputies arrived on the scene but did nothing to lower the temperature of the encounter. (*Id.* at 262–63). They told Defendant that his truck would be searched one way or another—it was just a question of whether it would be done the Border Patrol way or the Jim Hogg County way. (*Id.* at 263).

Defendant caved, admitting that there was a firearm in his vehicle. (*Id.*). Agent Martinez told him that he just wanted to look at the gun, and if it was neither stolen nor "dirty," Defendant would be allowed to leave. (*Id.* at 87, 264). Defendant agreed, and Agent Aguilar retrieved a pistol and bullets from Defendant's truck. (*Id.* at 222).

After stepping away to call his supervisor, Agent Martinez confirmed that a DACA recipient may not lawfully possess a gun. (*Id.* at 185–86). Despite the firearm being neither stolen nor "dirty," Defendant was taken into custody. (*Id.* at 264).

## III. ANALYSIS

The Fourth Amendment protects the right of the people against unreasonable searches and seizures, and the court-fashioned exclusionary rule requires "suppressing evidence obtained in violation of this command." *Davis v. United States*, 564 U.S. 229, 236 (2011). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception involves brief investigatory stops, provided that they comport with the requirements of *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, a court must first

7

determine if an investigatory stop was justified at its inception by reasonable suspicion of wrongdoing and then inquire into whether the officer's subsequent actions were "reasonably related in scope to either the circumstances that justified the stop or to dispelling a reasonable suspicion that developed during the stop." *United States v. Montes-Hernandez*, 350 F. App'x 862, 865 (5th Cir. 2009) (citing *United States v. Brigham*, 382 F.3d 500, 506–07 (5th Cir. 2004) (en banc)).

The Government "bears the burden of showing the reasonableness of a warrantless search or seizure." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (quoting *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005)). It admits that once Agent Martinez told Defendant that he could not leave without producing his identification, he was subject to an investigatory detention. (*See* Dkt. No. 46 at 11); *cf. United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). Defendant now challenges that detention as unlawful both at its inception and the time of his confession—that is, he argues that the agents failed to develop reasonable suspicion of wrongdoing to support his detention at the outset, and that even if they had, the legitimate scope of the stop was exceeded before he told agents about the firearm. Defendant asks that the evidentiary fruit of his detention therefore be suppressed.

**A. Reasonable Suspicion**

"Although a mere hunch does not create reasonable suspicion, the level of

suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2015) (quoting *Navarette v. California*, 134 S. Ct. 1683, 1678 (2014)). To evaluate reasonable suspicion in the context of a roving Border Patrol stop, the Fifth Circuit looks at the six *Brignoni-Ponce* factors:

> (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking in aliens or narcotics in the area; and (8) the number, appearance, and behavior of the passengers.

*United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975)). "No single factor is dispositive, and each case must be examined based on the totality of the circumstances known to the agents at the time of the stop and their experience in evaluating such circumstances." *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009) (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)).

While this case does not quite fit into the generic *Brignoni-Ponce* framework— it involves the seizure of an individual already outside of his vehicle—some of the factors are still relevant to determining whether a Border Patrol agent working near the border has reasonable suspicion to stop a person for an immigration check. It is the border context, not the person–vehicle dichotomy, that underlies the *Brignoni-Ponce* factors. *See Brignoni-Ponce*, 422 U.S. at 883–84 (noting that there is no distinction for Fourth Amendment purposes between stopping a vehicle to inquire if

the driver is smuggling aliens and stopping a person to determine their citizenship—both require reasonable suspicion); *see also United States v. Brown*, 209 F. App'x 450, 454 (5th Cir. 2006) (per curiam) (noting that the border–non-border context determines the application of the *Brignoni-Ponce* factors). Looking at the totality of the circumstances, Agent Martinez did not have reasonable suspicion to detain Defendant.

The Parties do not dispute the facts relevant to the first four *Brignoni-Ponce* factors: (1) Hebbronville is a small town approximately 56 miles east of the border; (2) it is a quiet community, light on local activity apart from Friday night football; (3) it is located along a route frequently traversed by smugglers; and (4) Agent Martinez, who has spent fifteen years working with Border Patrol, is experienced in detecting such illegal activity. It is noteworthy, though, that while the second, third, and fourth factors weigh in favor of reasonable suspicion, they would apply with equal force to any individual that the agent might detain in Hebbronville.

The last four *Brignoni-Ponce* factors, on the other hand, all weigh in favor of Defendant's position. As to the fifth and sixth factors, nobody testified that Defendant or his vehicle looked as though they had recently traversed the brush—there was no testimony, for example, that Defendant's clothing was dirty, that he smelled funny, or seemed nervous. The agent testified that his attention was drawn to the fact that Defendant was pulled over with his hazard lights on, but a driver pulling over to interact with his phone should not seem an out-of-place behavior for anyone who has traveled on this nation's highways in the past decade—whether the

person is responding to a time-sensitive e-mail, consulting a map application, or yes, even looking for their device between or under seats. While it might be true that many smugglers pretend to be having car troubles while they wait to transport undocumented individuals, Defendant's actions were hardly consistent with such behavior—his hazard lights were on for less than a minute before he got back in his vehicle and drove to the Lavame Car Wash. As to the seventh factor, the group of undocumented aliens that agents were tracking had allegedly been a twenty-minute walk from Defendant's location at least thirty minutes prior to his encounter with Agent Martinez; if they were actually headed toward Defendant's vehicle, they would have been loaded up and on the road before the agent even saw Defendant. And as to the eighth and final factor, Defendant had no passengers in his vehicle, let alone anyone who looked like they had recently been in the brush.

In light of those facts, Agent Martinez did not have reasonable suspicion to conduct an investigatory stop of Defendant when he detained him at the Lavame Car Wash.

**B. Scope of Investigation**

The Government argues that once Agent Martinez learned that Defendant was not a United States citizen, he had reasonable suspicion that Defendant was an unlawful alien, and that it was only in the course of investigating Defendant's legal status that officials learned of the firearm. But even setting aside the fact that Agent Martinez did not learn of Defendant's non-citizenship until after detaining him, the Government's argument contains a fatal flaw: reasonable suspicion of wrongdoing

11

does not give officials the right to hold an individual indefinitely and for all purposes.

A stop "become[s] unlawful if it is prolonged beyond the time reasonably required to" accomplish the purposes that gave rise to a legitimate detention.[3] "Both the scope and length of the officer's detention must be reasonable in the light of the facts articulated as having created the reasonable suspicion of criminal activity." *United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011) (citing *United States v. Pack*, 612 F.3d 341, 357 (5th Cir. 2010)). "Authority for the seizure thus ends when tasks tied to the [purposes of the detention] are—or reasonably should have been—completed." *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (discussing the permissible scope of a seizure made pursuant to a traffic infraction).

Here, Defendant did admit to Agent Martinez that he was neither a United States citizen nor a resident alien, but he truthfully added that he was a DACA recipient. To corroborate that claim, he gave the agent both his Texas Limited Term Driver's Permit and his DACA work authorization card. A few minutes later, agents confirmed that the documentation provided by Defendant was legitimate and that he was otherwise clean. At that point, any authority to detain Defendant dissipated; the purposes of the detention—determining whether Defendant had permission to be in the country—had been completed. Any further detention and questioning

---

[3] *See Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *see also id.* ("We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."); *United States v. Powell*, 137 F. App'x 701, 704 (5th Cir. 2005) ("[A]t the point that the purposes of the original detention are no longer supported by the facts that justified the initial stop, the detention must end, unless the officer can point to additional reasonable, articulable facts which would justify a continued detention." (citations omitted)).

impermissibly exceeded the scope of the stop.

## C. Exclusionary Rule

"Normally the fruits of illegal searches and seizures are not admissible in the prosecution's case in chief under the exclusionary rule." *United States v. Ramirez-Lujan*, 976 F.2d 930, 932 (5th Cir. 1992). But evidence can still be "admitted if it [is] derive[d] from an independent source, if the link to the illegally secured evidence is attenuated, or if it would inevitably have been discovered without the aid of the illegally obtained evidence." *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001) (citing *United States v. Miller*, 666 F.2d 991, 995 (5th Cir. 1982)). The Court must therefore consider whether Defendant's post-detention confession and evidence retrieved from his vehicle should be suppressed.

### 1. *Defendant's Confession*

Just like physical evidence, verbal statements are subject to the exclusionary rule. *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012). When the statement sought to be suppressed is a confession, relevant factors for deciding whether the confession was a product of free will, rather than fruit of an unlawful detention, include: "[t]he temporal proximity of the [agent's misconduct] and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the [agent's] misconduct." *Id.* at 621 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

All three factors weigh in favor of suppressing Defendant's confession. A maximum of 45 minutes elapsed between the point at which Defendant was

unlawfully detained and his relevant statements. *See id.* at 623 (noting that the temporal-proximity factor weighs in favor of suppression when only a few hours passed between the Fourth Amendment violation and the defendant's statement). And there are no intervening circumstances that would remove the taint of the unconstitutional detention—this is not a case, for example, where Defendant appeared before a magistrate after consulting an attorney, *see Johnson v. Louisiana*, 406 U.S. 356, 365 (1972), or a situation where Defendant returned to a police station several days after being released to give a voluntary confession. *See Wong Sun v. United States*, 371 U.S. 471, 491 (1963). Rather, this is a case where Defendant was detained and interrogated all within a 45-minute window and without being released. There is a direct and unbroken causal chain from the illegal detention to Defendant's admissions.

The final factor—the purpose and flagrancy of the misconduct—warrants special emphasis. It is certainly a flagrant violation of the Fourth Amendment for an officer to detain an individual without an objective basis for doing so. But even beyond that, there are real questions as to whether Agent Martinez acted with subjective bad faith or had an unsavory purpose in his dealings with Defendant. At multiple times on the stand, Agent Martinez admitted that he had "nothing on" Defendant (Dkt. No. 45 at 63, 96, 101, 148), but he held him until he did. And one need not wonder why: Agent Martinez clearly viewed Defendant's assertion of his constitutional rights and defiant attitude toward questioning as challenging his authority and machismo. Once the gauntlet was thrown, Agent Martinez would not

14

stop digging until he found some evidence that might allow him to lead Defendant away in handcuffs—even if that meant detaining Defendant without reasonable suspicion of wrongdoing, threatening to bring a dog to sniff out contraband in Defendant's truck, or lying about Defendant's eventual release if he would just let agents retrieve the firearm and confirm that it was clean.

Weighing all three factors in light of the exclusionary rule's purpose and its cost to the judicial system, the Court holds that Defendant's confession must be suppressed. Any other result would not deter—it could only incentivize—similar unconstitutional conduct in the future.[4]

### 2. *The Firearm and Ammunition*

The firearm and ammunition were only retrieved from Defendant's vehicle after he agreed to Agent Martinez's offer: the agents could look at the gun to ensure it was clean, and Defendant would be allowed to leave. A two-pronged inquiry is used to determine the validity of consent to a search when the consent was not given until after a Fourth Amendment violation: (1) whether the consent was given voluntarily,[5]

---

[4] Deterrence and incentive are different paths to the same goal: ensuring that officials act in accordance with the Constitution. *Compare Brown v. Illinois*, 422 U.S. at 602 ("Any incentive to avoid Fourth Amendment violations would be eviscerated by making [*Miranda*] warnings, in effect, a 'cure-all' [to any violation]."), *with Hernandez*, 670 F.3d at 624 ("If we were to rule the statements admissible, police officers would be encouraged to perform illegal searches in hopes of finding incriminating evidence against witnesses who would, in turn, have a reduced incentive to avoid confessing.").

[5] In considering whether consent was voluntary, courts in the Fifth Circuit consider six factors, "all of which are relevant, but no one of which is dispositive or controlling." *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (citation omitted). The factors are: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Id.* at 436 n.21 (quoting *United States v. Kelley*, 981 F.2d 1464,

and (2) whether it was an independent act of free will. *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (citing *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993)). What that means is that even if consent was voluntarily given, it "does not remove the taint of an illegal detention if [the consent was] the product of that detention and not an independent act of free will." *Id.* at 342–43 (citation omitted).

To determine whether the causal chain between an illegal detention and consent to search was broken, such that it would be considered an independent act of free will, courts look to the same free-will factors previously discussed: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the [agent's] misconduct." *Id.* at 343 (quoting *Chavez-Villarreal*, 3 F.3d at 128). As was explained above, each of those factors weighs in favor of suppression in this case.

A final argument that the Government asserts to stave off suppression of this evidence is that the agents obtained probable cause to arrest Defendant when he confessed to the presence of the gun, and that retrieval of the gun and bullets from the truck can be justified as a search incident to Defendant's arrest. But the Court has already concluded that Defendant's confession was procured by violation of the Fourth Amendment; thus, it did not give rise to probable cause to arrest Defendant. *See Hernandez*, 670 F.3d at 621 ("[J]ust as the officers could not have relied on

---

1470 (5th Cir. 1993)).

Hernandez's admission as probable cause to enter her home, they also could not have relied on the admission as probable cause to arrest her, because the officers' Fourth Amendment violation had already occurred, tainting Hernandez's admission.").

Because the unlawful detention of Defendant tainted evidence of the firearm and ammunition pulled from his truck, evidence of both must be suppressed.

## IV. CONCLUSION

Border Patrol's motto is "Honor First," but Defendant's treatment in this case falls short of that aspiration. Yes, both Defendant and Agent Martinez bear fault for raising the temperature of their encounter, but it was Defendant's rights that were violated that evening, not the other way around. Without just cause, agents detained Defendant while they engaged in a fishing expedition for any evidence of misfeasance. Despite some vindication of his rights in today's ruling, Defendant will still almost certainly lose his DACA status[6] and be subjected to removal proceedings; all because he mistakenly believed that he was allowed to possess a firearm, which even an experienced agent did not know was unlawful. The consequences of that mistake are outside of the Court's control, and the means used to discover it were, in this case, anything but honorable.[7]

Defendant's Motion to Suppress (Dkt. No. 20) is **GRANTED**. All statements

---

[6] It is not the Court's role to weigh in upon the wisdom of the DACA program; that is a matter left to the political branches of our government. The Court's review is limited to the legal issues presented by this case.

[7] The Court recognizes the difficult job that law-enforcement professionals voluntarily undertake, and the facts of this case demonstrate the importance of those professionals receiving proper training on the limits of their authority.

and evidence at issue are hereby **SUPPRESSED**.

It is so **ORDERED**.

**SIGNED** October 17, 2018.

_____
Marina Garcia Marmolejo
United States District Judge